## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Robert E. Blackburn

Criminal Action No. 19-cr-00099-REB

UNITED STATES OF AMERICA,

     Plaintiff,

v.

KENNETH AUNDRA BILLINGS,

     Defendant.

---

### ORDER DENYING MOTION FOR SENTENCE REDUCTION

---

**Blackburn, J.**

     The matter before me is defendant Kenneth Aundra Billings's **Motion To Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Compassionate Release)** [#47],[1] filed May 29, 2020.  The government filed a response under restriction ([#51], filed July 21, 2020, as later supplemented by [#55], filed August 11, 2020), and Mr. Billings filed a reply ([#54], filed July 28, 2020).  I have jurisdiction to consider Mr. Billings's request for sentence modification under 18 U.S.C. § 3582(c).  Having considered carefully the motion, response, and reply, the record, and the apposite law, I deny the motion.

     On August 22, 2019, Mr. Billings pled guilty to one count of possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c).  Two additional counts – for possession with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm by a prohibited person, in violation of 18 U.S.C.

---

[1] "[#47]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF).  I use this convention throughout this order.

§ 922(g)(1), were dismissed.  The court sentenced him to the Bureau of Prisons for a term of 60 months on November 22, 2019.  Assuming credit for time in custody awaiting sentencing, he has served approximately 18 months of this sentence with a projected release date is May 5, 2023.  (*See* **Gov't Resp. App.**, Exh. 4 at 2-3.)

Mr. Billings seeks compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, Pub. L. No. 115-391, 132 Stat. 5194 (Dec. 21, 2018).  One of the purposes of the First Step Act was to "increas[e] the use and transparency of compassionate release," *see* First Step Act, 132 Stat. at 5239, by expanding the universe of persons who could seek such relief.  Whereas previously, only the Director of the Bureau of Prisons could file a motion for compassionate release, ***United States v. Gutierrez***, – F.Supp.3d –, 2019 WL 1472320 at *1 (D.N.M. Apr. 3, 2019), now a defendant himself may seek such relief from the court, but only "after [he] has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," 18 U.S.C. § 3582(c)(1)(A).

Mr. Billings has requested compassionate release from the warden of FCI-Seagoville, in Seagoville, Texas, where he is currently housed, which request was denied.  (*See* **Motion App.**, Attachment C; **Govt' Resp. App.**, Exh. 2)  He thus has exhausted his administrative remedies.  The only remaining question is whether Mr. Billings meets the other requirements warranting an exercise of the court's discretion to

grant compassionate release.[2]  Because he does not, his motion must be denied.

The First Step Act did not change the substantive standards governing compassionate release.  A proposed sentence reduction still must be "supported by: (1) extraordinary and compelling reasons; (2) applicable policy statements issued by the Sentencing Commission[;] and (3) the factors set forth in [18 U.S.C. §] 3553(a)."  ***United States v. Willis***, 382 F.Supp.3d 1185, 1187 (D.N.M. 2019) (quoting 18 U.S.C. § 3582(c)(1)(A)(i))(internal quotation marks omitted).  Considering these factors as applied to Mr. Billings's case, none support an exercise of the court's discretion to grant the extraordinary remedy of compassionate release.

With respect to the first factor, Congress directed the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction."  28 U.S.C. § 994(t).  In response, the Commission issued USSG §1.B1.13. Under this policy statement, the court may reduce a term of imprisonment "if, after considering the factors set forth in 18 U.S.C. § 3553(a)," it determines that "[e]xtraordinary and compelling reasons warrant the reduction" and that "[t]he defendant

---

[2]  I note that Mr. Billings has not requested a hearing, nor would he be entitled to one if he had. Modification of a sentence under section 3582 is not a plenary resentencing.  ***Dillon v. United States***, 560 U.S. 817, 826, 130 S.Ct. 2683, 2691, 177 L.Ed.2d 271 (2010).  District courts have found the First Step Act does not permit plenary resentencing.  ***United States v. Lewis***, 398 F.Supp.3d 945, 972 (D.N.M. 2019); ***United States v. McKinney***, 382 F.Supp.3d 1163, 1165 (D. Kan. 2019); ***United States v. Lawson***, 2019 WL 1959490 at *3 (N.D. Ohio May 2, 2019); ***United States v. Glore***, 2019 WL 1761581 at *5 (E.D. Wis. April 22, 2019); ***United States v. Russo***, 2019 WL 1277507 at *1 (D. Neb. March 20, 2019); ***Potts***, 2019 WL 1059837 at *2.  Although the Tenth Circuit has not addressed this precise issue, it has confirmed that resentencing under 18 U.S.C. § 3582(c) is not plenary.  *See **United States v. Quary***, 881 F.3d 820, 822-23 (10th Cir. 2018).  Concomitantly, because a defendant need not be present for a proceeding that involves the correction or reduction of a sentence under 18 U.S.C. § 3582(c), *see* **FED. R. CRIM. P.** 43(b)(4), a hearing is not necessary to resolve a motion for relief under the First Step Act, *see **United States v. Smith***, 397 F.Supp.3d 1014, 1019 (W.D. Mich. 2019); ***Wright v. United States***, 393 F.Supp.2d 432, 441 (E.D. Va. 2019); ***Lewis***, 2019 WL 2192508 at *19 n.12; ***Russo***, 2019 WL 1277507 at *1; ***Davis***, 2019 WL 1054554 at *2.

is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)."  **USSG** §§1B1.13(1)(A) & (2).[3]

The policy statement sets forth specific examples of circumstances which may be considered extraordinary and compelling, including a defendant's terminal illness or debilitating medical condition, advanced age, or compelling family circumstances such as the death or incapacitation of the sole caregiver for the defendant's minor children. None of these categories apply to Mr. Billings.  Instead, he relies on the catch-all provision of the policy statement, by which compassionate release may be warranted for "an extraordinary and compelling reason other than, or in combination with, the reasons described in" the other subdivisions.  **USSG** §1B1.13, cmt. n.1(D).[4]  It is Mr. Billings's burden to prove extraordinary and compelling reasons warrant a sentence reduction.  ***United States v. Ng Lap Seng***, 2020 WL 2301202 at *3 (S.D.N.Y. May 8, 2020).  ***See also United States v. Jones***, 836 F.3d 896, 899 (8th Cir. 2016) ("It is the

---

[3]  Although the policy statement contemplates "[a] reduction under this policy statement may be granted only upon motion by the Director of the Bureau of Prisons," **USSG** §1B1.13, cmt. n.4, the Tenth Circuit has recently applied this guidance in a case in which the defendant filed his motion *pro se*, ***see United States v. Saldana***, 807 Fed. Appx. 816, 819(10th Cir. March 6, 2020), and "a majority of federal district courts have found that the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP director when it considers a compassionate release motion properly before it," ***United States v. Perez***, 2020 WL 1180719 at *2 (D. Kan. March 11, 2020).  ***See also United States v. Redd***, – F.Supp.3d –, 2020 WL 1248493 at *7 (E.D. Va. March 16, 2020) (by "authoriz[ing] courts to act independently of the BOP Director, upon a defendant's motion, once administrative remedies are exhausted . . . the First Step Act effectively amended U.S.S.G. § 1B1.13 by eliminating the requirement that a sentence reduction under § 3582(c)(1)(A) be 'upon motion of the Director of Bureau of Prisons,' as U.S.S.G. § 1B1.13 requires.").

[4]  The Bureau of Prisons has promulgated a list of nonexclusive factors it uses to determine whether "other" extraordinary and compelling reasons exist.  These include: the defendant's criminal and personal history; the nature of the offense; any disciplinary infractions; the length of sentence and the amount of time served; the defendant's current age and age at the time of offense and sentencing; the defendant's release plans; and"[w]hether release would minimize the severity of the offense." **BOP Program Statement** 5050.50 at 12 (2019) (available at:  https://www.bop.gov/policy/progstat/ 5050_050_EN.pdf ) (last accesses May 21, 2020).  ***See also Saldana***, 2020 WL 1486892 at *2.

defendant's burden to establish that he warrants a § 3582(c)(2) reduction."); ***United States v. Butler***, 970 F.2d 1017, 1026 (2nd Cir.) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."), ***cert. denied***, 113 S.Ct. 480 (1992).

Mr. Billings maintains that due to obesity and hypertension,[5] he is particularly susceptible to experiencing serious effects of exposure to COVID-19, which he claims is not adequately controlled at FCI-Seagoville.  Although the government concedes that these circumstances present extraordinary and compelling circumstances,[6] the court is not convinced.

The existence of the COVID-19 pandemic no doubt can be described as "extraordinary" insofar as it is "[b]eyond what is usual, customary, regular, or common."

---

[5]  Mr. Billings also suggests he is at increased risk of serious illness because he is African American.  There is some indication that African Americans (as well as members of other minority groups) in the population at large are more susceptible to COVID due to a variety of sociological and societal factors. (***See*** Sunjata Gupta, Science News, *Why African-Americans may be especially vulnerable to COVID-19* (April 10, 2020) (available at:  https://www.sciencenews.org/article/coronavirus-why-african-americans-vulnerable-covid-19-health-race) (last accessedd August 11, 2020); Dr. Sherita Hill Golden, Johns Hopkins Medicine, *Coronavirus in African Americans and Other People of Color* (April 20, 2020) (available at:  https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/covid19-racial-disparities) (last accessed August 11, 2020).)  Although some researchers suggest there also may be a biological component to African Americans' observed susceptibility to the disease (***see*** Tara Law, **TIME**, *Watch Doctors Explain Why COVID-19 May Be More Dangerous for African Americans* (May 7, 2020) (available at:  https://time.com/5833080/scientists-covid-19-african-americans-katie-couric/) (last accessed August 7, 2020)), that idea is neither proven nor uncontested (***see*** Clarence Gravlee, **SCIENTIFIC AMERICAN**, *Racism, Not Genetics, Explains Why Black Americans Are Dying of COVID-19* (June 7, 2020) (available at:  https://blogs.scientificamerican.com/voices/racism-not-genetics-explains-why-black-americans-are-dying-of-covid-19/) (last accessed August 11, 2020).)  It thus is entirely speculative whether Mr. Billings's race, in and of itself, increases his risks of contracting the virus or experiencing a more severe course of the virus.  This consideration therefore cannot be considered compelling.

[6]  The government's argument in this regard is somewhat confusing.  Although the government affirmatively "concedes the defendant has presented 'extraordinary and compelling reasons' under 18 U.S.C. §3582 and the Guidelines which allow this Court to consider him for compassionate release" (**Gov't Resp.**  ¶ 5 at 3), it then presents arguments suggesting it does not believe Mr. Billings's situation qualifies as extraordinary and compelling (***see id.*** ¶¶ 8-10 at 4-6).

5

*United States v. Rodriguez*, – F.Supp.3d –, 2020 WL 1627331 at *7 (E.D. Pa. April 1, 2020) (quoting Black's Law Dictionary, *Extraordinary* (11th ed. 2019)) (internal quotation marks omitted).  However, because the apposite test is stated in the conjunctive, the dangers presented by the pandemic – which impact us all, worldwide – also must be "compelling" in Mr. Billings's particular circumstances.  *See United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release." ).[7]  A need is "compelling" when it is "so great that irreparable harm or injustice would result if it is not met."  *Rodriguez*, 2020 WL 1627331 at *7 (quoting Black's Law Dictionary, *Compelling Need* (11th ed. 2019)) (internal quotation marks omitted).

People who suffer from certain underlying medical conditions also are considered at increased risk of severe illness should they contract COVID.  In particular, obesity is considered a proven factor for increased risk of severe illness, while hypertension is a possible factor.  (*See* Centers for Disease Control and Prevention, *People with Certain Medical Conditions* (available at:  https://www.cdc.gov/ coronavirus/2019-ncov/need-extra-precautions/people-with- medical-conditions.html? CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fn

---

[7]  *See also United States v. Bolze*, – F.Supp.3d –, 2020 WL 2521273 at *7 (E.D. Tenn. May 13, 2020) ("[T]he COVID-19 pandemic cannot present an extraordinary and compelling reason alone because the policy statement directs courts to consider individual reasons for compassionate release, not general threats to the prison population."); *United States v. Binraymond*, 2020 WL 2110577 at *2 (S.D. Ohio May 4, 2020) (defendant "failed to show that COVID-19 pose[d] a particular risk to him"); *United States v. Numann*, 2020 WL 1977117 at *3 (D. Alaska April 24, 2020) ("[T]he risks of COVID-19 have pervaded all corners of society and the possibility of contraction does not independently justify compassionate release.").

eed-extra-precautions%2Fgroups-at-higher-risk.html) (last accessed:  August 11, 2020).)  Mr. Billings is both obese and hypertensive, although he has been prescribed medication for his hypertension, and nothing in the evidence before the court suggests his condition cannot be adequately controlled thereby when he is compliant with his medication regimen.  (*See* **Gov't Resp. App.**, Exh. 6 at 6-7, 11.)  *See United States v. Ayon-Nunez*, 2020 WL 704785 at *2-3 (E.D. Cal. Feb. 12, 2020) (chronic conditions that can be managed in prison are not a sufficient basis for compassionate release).

There is no doubt that prisons have been a hot spot for rapid transmission of the COVID virus, and FCI-Seagoville has had by far the largest number of infections among all federal facilities in the country.  (*See* Kevin Reece, WFAA.com, *Federal Prison in Seagoville Reports First COVID Death as Infections Soar* (July 17, 2020) (available at: https://www.wfaa.com/article/news/health/coronavirus/federal-prison-in-seagoville-reports-first-covid-death-as-infections-soar/287-8687438d-777a-44d1-8cce-83ddd14d748d) (last accessed August 11, 2020).)  Nevertheless, the BOP has taken significant measures to limit inmates' movements and prevent congregate gatherings within the facility, in conjunction with the elimination of visitation and increased screening of staff, inmates, and a limited number of essential contractors allowed on site.  (*See* Federal Bureau of Prisons, *BOP Implementing Modified Operations* (available at: https://www.bop.gov/coronavirus/ covid19_status.jsp) (last accessed August 11, 2020).)[8]  Moreover, FCI-Seagoville has undertaken sweeping efforts in response to the

---

[8]  The BOP also collaborates and coordinates with the Centers for Disease Control on appropriate responses to the pandemic.  (*See* Federal Bureau of Prisons, *BOP's COVID-19 Collaborations Efforts* (available at:  https://www.bop.gov/coronavirus/overview.jsp#bop_emergency_response) (last accessed August 11, 2020; Centers for Disease Control and Prevention, *Interim Guidance on*

pandemic, implementing mass testing of all inmates and staff, checking inmates' temperatures twice daily, and providing cloth masks to all inmates.  (*See* LaVendrick Smith, THE DALLAS MORNING NEWS, *Federal Prison in Seagoville Conducting Mass Coronavirus Testing of Inmates, Officials Say* (June 30, 2020) (available at: https://www.dallasnews.com/news/public-health/2020/06/30/federal-prison-in-seagoville-conducting-mass-coronavirus-testing-of-inmates-officials-say/) (last accessed August 11, 2020).)  While three inmates unfortunately have died, another 1,288 – nearly 74% of the prison's population – have recovered from the virus.  (*See* Federal Bureau of Prisons, *COVID-19 Cases* (available at:  https://www.bop.gov/coronavirus/index.jsp) (last accessed August 11, 2020)).

Among that number is Mr. Billings himself.  His medical records indicate Mr. Billings tested positive for the virus on or about July 17, 2020.  (***See* Gov't Resp. App.**, Exh. 6 at 1; **Gov't Supp. Resp. App.**, Exh. 1 at 2, 9.)  He was isolated for at least twelve days, during which it was reported he did not have severe illness requiring hospitalization.  (**Gov't Supp. Resp. App.**, Exh. 1 at 1.)  Thus, despite his medical issues and living conditions, Mr. Billings presents no evidence to suggest he experienced any serious deleterious effects from being infected with COVID.  Moreover, nothing in the record indicates he has any lingering medical issues related to having contracted the virus.

---

*Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (available at:  https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html) (last accessed August 11, 2020).

Of course, it is not yet known whether having been infected with the COVID-19 virus confers immunity from reinfection, although there is some evidence suggesting recovered individuals may have at least temporary immunity.[9]  At this point, however, the possibility of reinfection, if not impossible, is strictly hypothetical.  That uncertainty militates against an entitlement to compassionate release.  ***See United States v. Entz***, 2020 WL 3542862 at *3 (W.D. Wash. June 30, 2020).  Indeed, in other cases where inmates have recovered from COVID without lingering symptoms, courts have found the theoretical risk of reinfection does not present a compelling reason warranting compassionate release.  ***See, e.g.***, ***United States v. Stout***, 2020 WL 4437464 at *2-4 (C.D. Ill. Aug. 3, 2020); ***United States v. Lavatai***, 2020 WL 4275258 at *3 (D. Haw. July 24, 2020); ***United States v. Buford***, 2020 WL 4040705 at *5-6 (E.D. Mich. July 17, 2020); ***United States v. Reece***, 2020 WL 3960436 at *6 (D. Kan. July 13, 2020); ***United States v. Davis***, 2020 WL 3790562 at *3 (S.D.N.Y. July 7, 2020).

---

[9] ***See, e.g.***, Dr. Robert D. Kirkcaldy, et al., *COVID-19 and Postinfection Immunity, Limited Evidence, Many Remaining Questions*, Journal of the American Medical Association 2245, 2246 (May 11, 2020) (available at: https://jamanetwork.com/journals/jama/fullarticle/2766097) ("[E]xisting limited data on antibody responses to SARS-CoV-2 and related coronaviruses, as well as one small animal model study, suggest that recovery from COVID-19 might confer immunity against reinfection, at least temporarily. However, the immune response to COVID-19 is not yet fully understood and definitive data on postinfection immunity are lacking.") (last accessed August 11, 2020); Dr. Francis Collins, NIH Director's Blog, *Study Finds Nearly Everyone Who Recovers From COVID-19 Makes Coronavirus Antibodies* (May 7, 2020) (available at: https://directorsblog.nih.gov/2020/05/07/study-finds-nearly-everyone-who-recovers -from-covid-19-makes-coronavirus-antibodies/) ("Although more follow-up work is needed to determine just how protective these antibodies are and for how long, these findings suggest that the immune systems of people who survive COVID-19 have been primed to recognize SARS-CoV-2 and possibly thwart a second infection.") (last accessed August 11, 2020).)  In addition, a recent study of 285 patients (and 790 individuals with whom they came in contact) from the Korea Centers for Disease Control and Prevention found that recovered COVID-19 patients who test positive again were not infectious.  ***See*** healthline, *People Who Test Positive for COVID-19 After Recovering Aren't Infectious* (May 26, 2020) (available at:  https://www.healthline.com/health-news/people-reinfected-with-covid-19-werent-infectious) (last accessed August 11, 2020).)

Although some courts have found compelling circumstances where a defendant suffering from other comorbidities already had been infected with COVID, those decisions appear to have been prompted more by the courts' concern that the facility was unable to address the defendant's other medical issues adequately.  ***See United States v. Bandrow***, 2020 WL 4050242 at *3, *6 & n.4 (E.D. Mich. July 20, 2020) (prison had been unable to address defendant's hematuria (the presence of blood in the urine, indicative of possible severe kidney disease) for more than six months); ***United States v. Yellin***, 2020 WL 3488738 at *3 (S.D. Cal. June 26, 2020) (76-year old inmate with multiple comorbidities unable to provide self-care under prison conditions); ***United States v. McCall***, – F.Supp.3d –, 2020 WL 2992197 at *5-*6  (M.D. Ala. June 4, 2020) (physician credibly testified that defendant's sickle cell disease made him especially vulnerable to risk of death from COVID and required close, regular monitoring which prison was unable to provide); ***United States v. Sholler***, – F.Supp.3d –, 2020 WL 2512416 at *5 (N.D. Cal. May 15, 2020) (defendant who suffered from incurable, progressive illness was completely disabled and totally confined to a bed or chair).  Mr. Billings's circumstances are not comparable.  There is nothing in the record to indicate his hypertension is not controlled with adherence to his prescribed medical regimen, and numerous courts have found that a defendant's obesity or obesity plus hypertension do not in themselves present compelling reasons warranting compassionate release.   ***See e.g.***, ***United States v. Pohahau***, 2020 WL 4588522 at *4 & n.5 (D. Haw. Aug. 7, 2020); ***United States v. Wilfred***, 2020 WL 4365531 at *5 (E.D. La. July 30, 2020); ***United States v. Lavatai***, 2020 WL 4275258 at *3 (D. Haw. July 24,

2020); ***United States v. Gordon***, 2020 WL 3971013 at *3 (E.D. Mich. July 14, 2020);

***United States v. Whiteman***, 2020 WL 4284619 at *1 (E.D. Pa. July 27, 2020); ***United***

***States v. Takewell***, 2020 WL 4043060 at *3 (W.D. La. July 17, 2020); ***United States v.***

***Wax***, 2020 WL 3468219 at *2-3 (D.N.J. June 25, 2020); ***United States v. Reynolds***,

2020 WL 3266532 at *4 (W.D. Wash. June 17, 2020).

   The court agrees with these decisions.  While the possibility of reinfection is not

zero, neither is the possibility that Mr. Billings now may have some degree of immunity

from COVID.  Nor can the court ignore that Mr. Billings experienced no serious

symptoms despite testing positive for the virus and has no reported lingering side

effects now that he has recovered.  Moreover, it appears that FCI Seagoville responded

quickly and appropriately once it determined Mr. Billings had contracted COVID, which

suggests the facility is presently well-positioned to cope with further cases.[10]  The

motion is subject to denial on this basis alone.

   Nevertheless, even if the court were to conclude that Mr. Billings is at elevated

risk from COVID-19, it still would find a sentence reduction to be unwarranted in this

case.  Even where extraordinary and compelling reasons are shown, a defendant still

must establish both that he does not present "a danger to the safety of any other person

or to the community, as provided in 18 U.S.C. § 3142(g)," and that the factors set forth

in 18 U.S.C. § 3553(a) warrant a sentence reduction.  **USSG** §§1B1.13(1)(A) & (2).

   Mr. Billings passes rather quickly over the requirement that he also prove he

---

[10]  Indeed, the record indicates Mr. Billings was tested two weeks prior to his positive test, suggesting the prison is working proactively to discover and address the disease.  (***See* Gov't Supp. Resp. App**., Exh. 1 at 12.)

does not present a danger to the community, *see* 18 U.S.C. § 3142(g); **USSG**
§§1B1.13(1)(A) & (2), stating merely that has not had a disciplinary infractions during
his current term of incarceration (*see* **Motion App.**, Attachment A).  While admirable,
this circumstance does not, by itself, suggest he will not be a danger once released
back into the community.  Indeed, his record indicates otherwise.

The gun charge to which Mr. Billings pled guilty in this case arose in connection
with the execution of a search warrant at his residence, during which substantial
evidence of crack cocaine manufacturing also was found.  (**Presentence Report**
[hereinafter "**PSR**"] ¶¶ 7-8 at 4 [#37], filed November 12, 2019.)  Yet this arrest was just
the latest in Mr. Billings's extensive criminal history.[11]  Mr. Billings first was arrested on
felony drug charges involving crack cocaine at age 20.  His deferred sentence was
revoked.  (**PSR** ¶ 20 at 7-8.)  He was arrested again for possession of crack cocaine at
age 24.  Mr. Billings was a mere four months into his three-year probationary sentence
for that offense before he was revoked, in part for testing positive for cocaine and
marijuana.  Sentenced to six years imprisonment, he was paroled and returned to
custody four times before finally completing his sentence in

November 2018.  (**PSR** ¶ 26 at 12-14.)[12]  Less than three months later, he was arrested

---

[11]   In addition to his lengthy history of arrest and conviction for possession, sale, and manufacture
of crack cocaine, Mr. Billings also has multiple other criminal convictions, starting at age 17, for vehicle
theft, battery upon assault-attempted battery, carrying a concealed weapon, public intoxication, resisting
law enforcement, felony menacing, false statement, resisting arrest, and myriad driving offenses.  (*See*
**PSR** ¶¶ 14-19 at 5-7, ¶¶ 21-25 at 8-12, ¶ 29 at 17.)

[12]   That sentence also included time on two other felony drug convictions.  (*See* **PSR** ¶¶ 27-28 at
14-16.)

on the charges that underlie his current federal sentence.[13]

This record indicates Mr. Billings has respect for neither the law nor judicial authority.  Nor has he shown what, if any, measures he has taken during his time in prison to educate himself, develop life or job skills,[14] or otherwise prepare himself for a life outside of prison that does not revolve around the manufacture, possession, distribution, and sale of drugs.[15]  The court thus has no trouble concluding Mr. Billings poses a continuing clear and present danger to the community and does not warrant further leniency.

For these and additional reasons, the court also cannot find the applicable section 3553(a) factors warrant an exercise of its discretion to reduce Mr. Billings's sentence.  *Dillon v. United States*, 560 U.S. 817, 827, 130 S.Ct. 2683, 2692, 177 L.Ed.2d 271 (2010) (even where other considerations are satisfied, court still must consider "any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case").  These factors include, but are not limited to (1) the nature and circumstances of the offense and the history

---

[13]  The court notes further that at the time of his arrest on this instance offense, Mr. Billings was living with his mother.  (*See* **PSR** ¶ 46 at 20.)  He also was living with his mother from 2014 to 2016 and in 2017, during which periods he again was arrested on parole violations and returned to custody.  (*See* **PSR** ¶ 41 at 19.)  Thus his representation that he will living with his mother if granted compassionate release does little to assuage the court's concerns as to his dangerousness.

[14]  Mr. Billings avers he has taken anger management classes.  (**PSR** ¶ 4 at 3.)  While that fact addresses some of the concerns about his dangerousness to the community, it says nothing about the danger posed by his virtually unbroken history of drug offenses.

[15]  Although Mr. Billings told the probation officer he typically was able to find work, his past attempts at legitimate employment have been terminated by his arrests and convictions.  (*See* **PSR** ¶¶ 60-61 at 22.)

and characteristics of Mr. Billings; (2) the need for the sentence imposed to (a) reflect

the seriousness of the offense, promote respect for the law, and provide just

punishment for the offense (b) afford adequate deterrence to criminal conduct; and (c)

protect the public from further crimes of Mr. Billings; (3) the sentencing ranges under the

Guidelines; (4) the pertinent policy statements of the Sentencing Commission; and (5)

the need to avoid unwarranted sentence disparities among defendants with similar

records who have been found guilty of similar conduct.  18 U.S.C. §§ 3553(a)(1), (2),

(4), (5), and (6).[16]

The court has discussed already how the nature and circumstances of the

offense and the history and characteristics of Mr. Billings do not warrant a sentence

reduction.  Mr. Billings does not address the remaining section 3553 factors, and they

do not alter the court's calculus in any event.  In particular, reducing Mr. Billings's extant

sentence, of which he has served less than half, would fail to reflect the seriousness of

the offense, promote respect for the law, provide just punishment, or deter similar

criminal conduct by him or others similarly situate or inclined.

For these reasons, Mr. Billings's motion for compassionate release must be

denied.

**THEREFORE, IT IS ORDERED** that Mr. Billings's **Motion To Reduce Sentence**

**Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (Compassionate Release)** [#47], filed May

---

[16]  Mr. Billings devotes the bulk of this section of his brief to reiterating his arguments regarding the difficulty of controlling the spread of COVID-19 in a prison setting and his own vulnerability to the disease.  Mr. Billings cites no authority, and the court has found none, suggesting that these factors are relevant to the court's consideration of the section 3553 factors.

14

29, 2020, is denied.

Dated August 13, 2020, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge